No. 2021-1799

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

MARY BARNES,
Petitioner,

v.

GENERAL SERVICES ADMINISTRATION,
Respondent.

Petition For Review Of The Merit Systems Protection Board
In No. DC-0752-20-0202-I-2

## BRIEF OF RESPONDENT, GENERAL SERVICES ADMINISTRATION

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

TARA K. HOGAN
Assistant Director

BRET R. VALLACHER
Trial Attorney
Commercial Litigation Branch
Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-0465

September 20, 2021                    *Attorneys for Respondent*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUES ..............................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS ........................................................................3

   I.   Ms. Barnes's GSA Role, Her Side Business, And The Bali Retreat..............3

   II.  Ms. Barnes's Initial Leave Request And The Partial Denial ........................4

   III. Ms. Barnes's Escalating Attempts To "Fight" The Denial ...........................6

        A. Discussions with Ms. Sieveke and Ms. Philcox ...................................6

        B. Misrepresentations and Threatened Resignation Directed At Ms.
        Sieveke And Broadcast To Many Others ...................................................8

        C. Attempted Invocations Of FMLA And Sick Leave Protections...........10

   IV. Ms. Barnes's Extended Absence Without Leave .........................................16

   V.  The Proposed Removal & Agency Action ....................................................16

   VI. The Board Sustains All Three Charges And The Penalty Of Removal ........17

SUMMARY OF ARGUMENT ................................................................17

ARGUMENT ..........................................................................................19

   I.   Standard Of Review.......................................................................................19

   II.  Ms. Barnes Has Failed To Meet Her Burden Of Establishing Reversible
      Error Regarding The Board's Determination That Ms. Barnes Was Absent
      Without Leave ...............................................................................................20

        A. Substantial Evidence Supports The Board's Conclusion That Ms.
        Sieveke Reasonably Denied Ms. Barnes's Sick Leave Request ...............22

        B. Ms. Sieveke's Request For Additional Information Was Proper .........28

   III. Ms. Barnes Has Failed To Meet Her Burden Of Establishing Reversible
      Error Regarding The Board's Determination That Ms. Barnes Showed A
      Lack Of Candor ............................................................................................32

        A. The Board's Determination To Sustain The Lack of Candor Charge
        Regarding Specification 1 Was Supported By Substantial Evidence and In

Accordance With Law ...............................................................33

B. The Board's Determination To Sustain The Lack of Candor Charge Regarding Specification 2 Was Supported By Substantial Evidence and In Accordance With Law ...............................................................37

IV. Ms. Barnes Has Failed To Meet Her Burden Of Establishing Reversible Error Regarding The Board's Determination That Ms. Barnes Engaged In Conduct Unbecoming A Federal Employee...................................................41

V. The Court Should Not Disturb The Board's Determination That Removal Was A Reasonable Penalty............................................................44

CONCLUSION ....................................................................49

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Soc. Sec. Admin.*,
  703 F.3d 538 (Fed. Cir. 2012) ............................................................19

*Archuleta v. Hopper*,
  786 F.3d 1340 (Fed. Cir. 2015) ...................................... *passim*

*Beverly v. U.S. Postal Serv.*,
  907 F.2d 136 (Fed. Cir. 1990) .............................. 24, 27, 41

*Brewer v. U. S. Postal Serv.*,
  647 F.2d 1093 (Ct. Cl. 1981) ....................................... *passim*

*Bryant v. Nat'l Sci. Found.*,
  105 F.3d 1414 (Fed. Cir. 1997) ........................................21

*Carroll v. Dep't of Health & Human Servs.*,
  703 F.2d 1388 (Fed. Cir. 1983) ........................................20

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*,
  305 U.S. 197 (1938).........................................................20

*Douglas v. Veterans Administration*,
  5 M.S.P.R. 280 (1981) ................................................ *passim*

*Fernandez v. Dep't of Army*,
  234 F.3d 553 (Fed. Cir. 2000) ...................................... *passim*

*Garner v. Dep't of Treasury*,
  127 F. App'x 477 (Fed. Cir. 2005) ....................................47

*Gray v. U.S. Postal Serv.*,
  2005 WL 1368093 (Fed. Cir. June 9, 2005).........................41

*Graybill v. U.S. Postal Serv.*,
  782 F.2d 1567 (Fed. Cir. 1986) ........................................46

*Guise v. Dep't of Just.*,
  330 F.3d 1376 (Fed. Cir. 2003) ............................................................45

*Hambsch v. Dep't of Treasury*,
  796 F.2d 430 (Fed. Cir. 1986) ............................................................41

*Hayes v. Dep't of Navy*,
  727 F.2d 1535 (Fed. Cir. 1984) ..........................................................19

*Henry v. Dep't of Navy*,
  902 F.2d 949 (Fed. Cir. 1990) ..................................................... *passim*

*Ludlum v. Dep't of Just.*,
  278 F.3d 1280 (Fed. Cir. 2002) ................................................... *passim*

*Martin v. Dep't of Homeland Sec.*,
  855 F. App'x 691 (Fed. Cir. 2021) ............................................... 32, 35

*Naekel v. Dep't of Transp.*,
  782 F.2d 975 (Fed. Cir. 1986) ............................................................32

*Nagel v. Dep't of Health & Human Servs.*,
  707 F.2d 1384, (Fed. Cir. 1983) ........................................................49

*New-Howard v. Dep't of Veterans Affs.*,
  590 F. App'x 972 (Fed. Cir. 2014) ....................................................30

*Noble v. U.S. Postal Serv.*,
  556 F. App'x 941 (Fed. Cir. 2013) ....................................................20

*Ottinger v. Dep't of Air Force*,
  82 F.3d 434 (Fed. Cir. 1996) ............................................................23

*Parker v. U.S. Postal Serv.*,
  819 F.2d 1113 (Fed. Cir. 1987) .................................................. 19, 31

iv

*Rivers v. Dep't of Veterans Affs.*,
   153 F. App'x 716 (Fed. Cir. 2005) ........................................................26

*Shapiro v. Social Sec. Admin.*,
   800 F.3d 1332 (Fed. Cir. 2015) ...........................................................19

*Taylor v. U.S. Postal Serv.*,
   393 F. App'x 717 (Fed. Cir. 2010) .............................................. 26, 29

*Thom v. Dep't of Army*,
   114 M.S.P.R. 169 (M.S.P.B. 2010) ......................................................30

*Washington v. Dep't of Army*,
   813 F.2d 390 (Fed. Cir. 1987) .............................................................25

*Wesley v. U.S. Postal Serv.*,
   94 M.S.P.R. 277 (2003) .......................................................................20

*Woodson v. Dep't of Homeland Sec.*,
   280 F. App'x 976 (Fed. Cir. 2008) ......................................................47

## Statutes

5 U.S.C. § 6382 ........................................................................... 34, 36

5 U.S.C. § 7703 ...................................................................................19

## Regulations

5 C.F.R. § 630.201 ..............................................................................28

5 C.F.R. § 630.401 ...................................................................... *passim*

5 C.F.R. § 630.405 ...................................................................... *passim*

## **STATEMENT OF RELATED CASES**

Pursuant to Rule 47.5, respondent's counsel states that he is unaware of any other appeal in or from these actions that previously were before this Court or any other appellate court under the same or similar title.  Respondent's counsel is unaware of any other cases currently pending before this Court or any other court that will directly affect or be directly affected by the Court's decision in this case.

## **INTRODUCTION**

Prior to her removal, the petitioner, Mary Barnes, held a senior-level role as a Program Management Officer at the General Services Administration (GSA or agency). In early 2019, Ms. Barnes decided to plan and organize a retreat in Bali for her own business venture. To that end, Ms. Barnes requested six weeks of leave using a combination of annual leave and leave without pay. When her supervisor only granted her two weeks of leave, Ms. Barnes refused to take "no" for an answer and undertook a scorched-earth series of actions that culminated in her removal. Among other things, Ms. Barnes threatened to resign if her leave requests were denied. When that bluff failed, Ms. Barnes attempted to secure leave by abusing protections afforded Federal employees who are medically incapacitated or who have family members who urgently need their assistance due to medical issues. When that gambit also failed, Ms. Barnes proceeded to go on her trip to Bali, resulting in a seven-week absence—despite never being granted leave beyond the original two weeks.

The GSA removed her from Federal service on charges of absence without leave (AWOL), lack of candor, and conduct unbecoming a Federal employee. The Merit Systems Protection Board (MSPB or board) affirmed the agency's action. In this appeal, Ms. Barnes seeks to overturn the board's decision primarily on the

grounds that the board did not adopt her own implausible account of events.  As explained below, substantial evidence more than supports the MSPB's decision.

## STATEMENT OF THE ISSUES

1.    Whether Ms. Barnes has met her burden of establishing reversible error regarding the board's determination that Ms. Barnes was absent without leave where it is undisputed that she was absent from work for seven weeks and that her supervisor did not approve leave for five of those weeks.

2.    Whether Ms. Barnes has met her burden of establishing reversible error regarding the board's determination that Ms. Barnes showed a lack of candor when, after her initial requests for annual leave were denied, she sought FMLA and sick leave for the purposes of traveling to Bali for a retreat she had organized as part of a separate business venture.

3.    Whether Ms. Barnes has met her burden of establishing reversible error regarding the board's determination that Ms. Barnes engaged in conduct unbecoming a Federal employee when she sent an email to her supervisor, with copies to other senior officials and her subordinates, in which she misrepresented her supervisor's actions and threatened to resign unless her leave request was granted.

4.      Whether Ms. Barnes has met her burden of establishing reversible error regarding the board's determination that the penalty of removal was reasonable.

## STATEMENT OF THE CASE

Ms. Barnes appeals from a February 4, 2021, MSPB initial decision, which became final on March 11, 2021, and which affirmed the agency's decision to remove her from Federal service. *See* Appx1–40.[1]  The board sustained the agency's three charges and determined that the penalty of removal was reasonable and supported the efficiency of the service. *Id.*

## STATEMENT OF FACTS

### I.      **Ms. Barnes's GSA Role, Her Side Business, And The Bali Retreat**

Prior to her removal, Ms. Barnes was a Program Management Officer and the director of the Workforce Transformation Division at the GSA.  Appx157.  That role "requires exceptional coordination and integration of a number of very important and complex program segments or programs" and "involves major decisions and actions which have a direct and substantial effect on the organization and programs managed."  Appx306.  In that capacity, Ms. Barnes "[d]irectly supervise[d] senior administrative, technical and support positions," Appx305, and

---

[1]  "Appx" refers to the joint appendix, which Ms. Barnes will file on behalf of both parties in accordance with Federal Circuit Rule 30(a)(2).

3

had 80 direct reports, Appx166, Appx37.  Ms. Barnes' first line supervisor was

Tricia Sieveke, the chief of staff of the Federal Acquisition Service.  Appx49–51.

Concurrently, Ms. Barnes also ran a coaching and consulting business on the

side, called "Evolve."  Appx161.  In early 2019, Ms. Barnes decided to organize a

retreat in Bali for this business venture.  On March 27, 2019, Evolve's social media

account advertised a "retreat" in Bali.  Appx370.  Evolve also advertised charging

$5,000 (and a discounted price of $4,500) per person to attend this retreat.

Appx365.  Ms. Barnes viewed the trip as a way to "kill two birds with one stone"

to "get the break" that she needed "while also allowing other executive women" to

help her "engage [her] brain in a different way." Appx168.

## II.    Ms. Barnes's Initial Leave Request And The Partial Denial

 "Once [she] realized that there was some traction" to the Evolve retreat in

Bali, Ms. Barnes requested leave.  Appx168.  On April 16, 2019, Ms. Barnes

informed Ms. Sieveke that she had "an event this summer in Bali that will take

[her] out of the country for 6 weeks," and proposed using a "combination of annual

and [leave without pay] requests" to cover that time.  Appx333.  Ms. Barnes

further stated: "In order to keep things moving forward here, I am also planning to

work 2-3 hours per weekday." *Id.*  Ms. Barnes clarified that her plan was to

"designate an acting director while [she was] gone, but the 2-3 hours a day will allow [her] to provide guidance and advice as needed." *Id.*

By email on April 29, 2019, Ms. Sieveke denied the leave request based on the "business needs of the organization." Appx334. In light of Ms. Barnes's "supervisory position," Ms. Sieveke explained that Ms. Barnes' proposed six-week absence would not allow the GSA to "maintain adequate supervisory controls," and Ms. Barnes's "management and oversight" of the Executive Leaders Program would be "ineffective from overseas or for that length of time out of office." *Id.* Ms. Sieveke's concern regarding the lack of adequate supervisory controls stemmed from the fact that Ms. Barnes "did not have a deputy," and, in fact, "did not have any other supervisors in her organization," Appx80, and that many of Ms. Barnes's responsibilities involved "day to day" work, including "a series of rolling capabilities assessments that relied on Ms. Barnes . . . being there and participating." Appx81–83.

Ms. Sieveke also explained that GSA's telework policy prohibited employees, other than those serving on an overseas tour, from teleworking outside of the United States and its territories. Appx334. Accordingly, Ms. Barnes's plan to use a combination of telework and the designation of an acting director, Appx333, would not work. Ms. Sieveke approved two weeks of annual leave from

5

August 2nd through August 16th, but the remaining weeks through September 16th were not approved.  Appx68–69, *see also* Appx335.

## III.    Ms. Barnes's Escalating Attempts To "Fight" The Denial

Ms. Barnes refused to take "no" for an answer and, instead, began a series of tactics to change or otherwise evade Ms. Sieveke's denial.

### A.    Discussions with Ms. Sieveke and Ms. Philcox

Ms. Barnes began by discussing the denial with Ms. Sieveke after her mid-year review in May of 2019.  Appx170.  According to Ms. Barnes, Ms. Sieveke defended her denial on one additional basis: Ms. Sieveke "approved leave for all of the assistant commissioners in the organization and did not want to set a precedent of this long of a leave."  Appx170–171.

At the time of this meeting, two divisions in Federal Acquisition Services were undergoing a reorganization, and once the reorganization was finalized, Ms. Barnes would report to Crystal Philcox.  *See* Appx59, Appx90, Appx171, Appx282.  In this meeting, Ms. Barnes pointed out that, because of this reorganization, Ms. Philcox would potentially be her supervisor by the time of her planned trip to Bali.  Appx171; *accord* Appx59.  Ms. Barnes requested to speak with Ms. Philcox to run her leave proposal by Ms. Philcox in advance of the reorganization being finalized.  Appx59; *accord* Appx171.

6

Ms. Sieveke testified that she did not object to "preliminary discussions" about Ms. Barnes's leave proposal, but any such leave decision by Ms. Philcox "was predicated on the order going through and being implemented." Appx59. This is consistent with the undisputed fact that Ms. Sieveke, as Ms. Barnes's supervisor, was the only one with the authority to grant or deny Ms. Barnes's leave requests until the reorganization order was implemented. Appx51. In fact, as discussed in Statement of Fact section III.C, *infra*, it is also consistent with Ms. Barnes's explanation to a human resources representative that her leave "remained denied" because the re-organization did not occur.

Ms. Barnes then met with Ms. Philcox, who subsequently informed her by email on June 3, 2019, that she had discussed the matter with Ms. Philcox's supervisor who was "comfortable" with granting Ms. Barnes's "sabbatical" and that a "mix of leave and LWOP would be most appropriate." Appx323. However, when Ms. Barnes found out in mid-July that the reorganization order had not been processed, she contactedMs. Sieveke because the leave "was not in the system" and "was still in limbo." Appx174–175. In response, Ms. Sieveke reminded Ms. Barnes that, because the order for the reorganization had not been signed, Ms. Sieveke remained her supervisor and her leave request remained denied. Appx175, Appx265, Appx328. Ms. Sieveke subsequently confirmed that her "position

remains the same" regarding the leave request and reiterated her concerns. Appx328.

Ms. Barnes then asked Lakita Rivero of human resources whether she had any options to "fight" this lack of approval. Appx324. One of the options for circumventing Ms. Sieveke's disapproval that Ms. Barnes explored was being temporarily detailed to Ms. Philcox's division. Appx327. She inquired about this possibility with Ms. Philcox, and suggested that, unless she could be detailed, she would submit her resignation, Appx327, which would "leave [her] team and several executives [she had] been working with in a lurch." Appx328. There is no evidence in the record that this detail was ever approved. Ms. Sieveke testified that there was no "business reason" to "detail her prior to the implementation of the order," and that "working outside of the boundaries of an established process just to try to get this leave accomplished" would have "created an appearance of favoritism." Appx91–92.

## B. Misrepresentations and Threatened Resignation Directed At Ms. Sieveke And Broadcast To Many Others

Having exhausted these options, Ms. Barnes sent an email to Ms. Sieveke on July 22, 2019, titled "My conditional resignation," in which she threatened to resign. Appx335. Ms. Barnes also sent the email to the Federal Acquisition Services Leadership Council, whose members she consulted and coached, along

with 10 other GSA employees, including subordinates. Appx157. The email stated that Ms. Sieveke "rescinded the approval for [her] sabbatical" and that Ms. Sieveke "refused to honor the approved leave." Appx335. Notably, Ms. Barnes also threatened: "If the impending reorg to move my group under QP [Ms. Philcox's division] isn't final and/or you still refuse to honor my approved sabbatical leave or detail me over to QP in advance of the order, this email will serve as my resignation, effective August 17." Appx335. The email also highlights that she copied "key stakeholders to notify them of my intent since August 1 may be the last opportunity for them to have access to me before I am *forced to resign*." Appx335 (emphasis added). However, as the administrative judge found, at no point did Ms. Sieveke or any other official require Ms. Barnes's resignation. Appx26.

Ms. Sieveke testified that she considered this email to be "an ultimatum" that was "designed to intimidate" her and "to get other senior leaders involved in hopes that [Ms. Sieveke] would stand down in [her] decision." Appx67. Thomas Howder, the deputy commissioner for GSA's Federal Acquisition Service, Appx112, similarly testified that these statements about Ms. Sieveke "disparaged her reputation in front of her peers" and that the audience Ms. Barnes copied to the email was "wholly inappropriate" and "completely unprofessional." Appx115.

9

Apparently confident that this "conditional resignation" would work, Ms.

Barnes posted on the Evolve social media page on July 28, 2019, that "this time

next week, I'll be on a plane on my way to #bali."  Appx369.

### C.    Attempted Invocations Of FMLA And Sick Leave Protections

When her bluff regarding her "conditional resignation" failed to produce

results, Ms. Barnes next attempted to secure her trip to Bali by invoking FMLA

protections afforded Federal employees who are medically incapacitated or who

have family members who urgently need their assistance due to medical issues.

By email on August 1, 2019, Ms. Barnes informed Ms. Sieveke that she was

"formally requesting leave in accordance with the Family Medical Leave Act for a

period of 7 weeks in connection with [her] recently diagnosed health condition."

Appx292.  She attached a "Certification of Health Care Provider for Employee's

Serious Health Condition under the Family and Medical Leave Act" form,

completed by her doctor regarding Ms. Barnes's visit that same day.  Appx294–

300.  The form indicated that Ms. Barnes had "high blood pressure," Appx295, but

an attachment ordering laboratory work clarified a finding of "elevated blood

pressure reading without diagnosis of hypertension," Appx300.  The remainder of

the diagnoses appear to be based on self-reporting: "headache due to anxiety,

symptoms of fatigue, depressed mood, severe anxiety and stress."  Appx295.  The

10

treatment plan revealed that Ms. Barnes would not be prescribed any medications, and, although she would receive two referrals, Appx298–299, Ms. Barnes admitted she never pursued them, Appx203.

The form indicated that Ms. Barnes would be unable to work for the period of August 1, 2019, through September 20, 2019, Appx296—covering the entirety of the dates for which Ms. Barnes originally sought annual leave for the retreat in Bali. Paradoxically, the form also indicated that a reduced work schedule was "not needed," and that, after her leave, there would be no further events that would prevent Ms. Barnes from performing her job or making it medically necessary for her to be absent.  Appx296.

On August 8, 2019,[2] Ms. Sieveke "provisionally approved 200 hours of FMLA-related leave pending review of the medical documentation."  Appx290. She advised Ms. Barnes that her submitted documentation was not sufficient.  The memorandum explained that the documentation was lacking in several ways:

> [B]ased on your doctor's statements, it appears that you were treated once on 8/1/2019 and she did not validate the nature and/or history of your medical conditions; specify the effects of your condition; the frequency and duration of the symptoms; and why you are not able to perform any of your job functions.  Additionally, your doctor noted that you suffered from various symptoms at the time of the visit (8/1/2019).  For this reason, your doctor assessed that while you

---

[2] The date of this document (2018) is a scrivener's error, as evidenced by the memorandum describing events taking place in 2019.

11

do not have a diagnosis of hypertension your bloodpressure was elevated and you experienced a migraine headache at the time of the visit.    Further, your doctor did not specify how your treatment schedule for behavioral therapy conflicts with your ability to perform your job duties. Instead, it states that you will be reevaluated after 9/20/2019, which is the date your unapproved leave ends.

Appx290.  The memorandum also specified eight requests for further information:

1. The medical certificate stated Ms. Barnes suffers from various symptoms. Describe and explain the nature and severity of Ms. Barnes' medical conditions;

2. Describe and explain the current medical limitations imposed on Ms. Barnes resulting from the disabling condition/s and/or negative side effects from any mitigating measures;

3. As the Director Workforce Transformation Division, Ms. Barnes is responsible for leadership oversight over more than 90 staff and several program areas to drive initiatives, education and awareness. The Workforce Transformation work is driven by quick turnaround delivery and high-impact exposure. As the Director, it requires a great deal of Ms. Barnes' availability, adaptability, and dedicated attention.  Please explain the extent Ms. Barnes' limitations impede her ability to perform her job duties;

4. The medical certificate noted that Ms. Barnes is not able to perform "high level executive function." Please (a) identify the "high level executive functions" with specificity, and (b) describe the extent to which Ms. Barnes' undisclosed medical condition(s) substantially limits her ability to perform her job duties as a result of the "high level executive function;"

5. Please explain the triggers and symptoms associated with Ms. Barnes' conditions as it relates to performing her job duties in the workplace;

6. Management approved for Ms. Barnes to take time away from work (two weeks). Additionally, management is willing to allow Ms. Barnes appropriate leave time to attend to sessions and treatment that

12

conflict with her work schedule during the time period. Please explain, with specificity, why the proposed flexibility is ineffective;

7. Also, list the date Ms. Barnes' behavioral therapy will begin. Please provide the date(s) visits/treatment started with the neurologist and licensed clinical social worker;

8. Please explain any medically imposed restrictions placed on Ms. Barnes that may impede her ability to meet her job requirements;

Appx290–291. Finally, Ms. Sieveke explained that the "[u]pdated medical documentation must be provided within seven (7) calendar days from the date of this request" and that Ms. Barnes' failure to provide the requested, complete, certification within that time period could result in the denial of her request. Appx291.

Ms. Barnes never provided this information. Instead, on August 9, 2019, she had a conversation with an employee relations specialist named Emily Plank,[3] Appx181, who was identified by the memorandum as the point of contact for any questions concerning its contents, Appx291. That conversation was memorialized in an email by Ms. Plank to Ms. Barnes, Appx336, which Ms. Barnes said seemed "accurate," Appx337, and which Ms. Plank corroborated at the MSPB hearing, Appx65–66.

---

[3] Emily Plank, at the time of the MSPB hearing, went by Emily Claybrook. Appx106.

13

Ms. Plank's summary demonstrates that Ms. Barnes knew that she was invoking FMLA leave without knowing whether she was eligible, but was doing so in order to side-step her supervisor's denial of her annual leave request. In relevant part, the email states:

> You indicated that you don't know if FMLA is necessary for your absence, as you don't need disability or "ongoing things". You stated that you had tried to utilize your accrued leave without invoking FMLA, but your supervisor wouldn't approve more than 2 weeks of leave.

Appx336. The email also demonstrates that Ms. Barnes knew that Ms. Sieveke denied her leave and that Ms. Philcox's opinion on her leave was only binding if and when the reorganization was finalized. In relevant part, the email states:

> You indicated that **you created a six week sabbatical for yourself using your accrued leave**. **You requested the leave back in April, and your supervisor denied the request**. She stated that she didn't want to set a precedent of approving that much leave. **A reorganization was pending, and you asked your future supervisor if she would approve the leave. You stated that she agreed to approve the leave**, and you moved forward with your plans. **However, the re-organization was delayed, and the leave remained denied.** You indicated that you submitted your conditional resignation if the re-organization didn't go through as of 8/16 due to your appointments and commitments.

Appx336 (emphases added). Additionally, the email demonstrates that Ms. Barnes intended to use the leave to destress, which is why she did not want to use FMLA leave:

14

> You mentioned various symptoms brought on by stress and indicated
> that you need to be away from the office to focus on self-care for the
> 6 weeks you had planned. **You reiterated that FMLA is not**
> **something you wanted to do; you wanted to use accrued leave**.

Appx336.  Finally, the email indicates that Ms. Barnes wished to explore "utilizing

sick leave rather than FMLA" and inquired about "the documentation required."

Appx336.  Ms. Plank informed Ms. Barnes that Lakita Rivero of human resources

would review her medical documentation to "determine if it is sufficient to grant

accrued sick leave (non-FMLA)."  Appx336.

On August 15, 2019, Ms. Barnes emailed Ms. Sieveke and Ms. Philcox to

withdraw her conditional resignation, to withdraw her FMLA leave request, and to

request sick leave through the same September 20, 2019 date.  Appx338.  She then

re-characterized the medical documents she sent in support of her previous FMLA

request.  Appx338.

The next day, Ms. Sieveke replied, explaining that Lakita Rivero had

determined that her documentation was not sufficient to approve sick leave.

Appx339.  The defects outlined by Ms. Rivero reflected the same defects that Ms.

Sieveke identified in her August 8, 2019 memorandum:

> While your doctor checked "yes" to box 5 stating that you will be
> incapacitated for a single continuous period of time from 8/1/19 -
> 9/20/19, your doctor does not state the reason.

> Also, the meaning of High Level Executive Function is not explained
> in detail regarding the job functions you are unable to perform.

> Lastly, your email responses on 8/13/19 regarding effects of your condition, frequency and duration of systems, and why you can't perform you job must be answered by your doctor.

Appx339.  Ms. Sieveke indicated that because Ms. Barnes had not provided the follow-up information requested, she was denying the request for sick leave. Appx339.  Finally, Ms. Sieveke advised her that she would be noted as AWOL on her time sheet beginning the following Monday (August 19, 2019) because she was "not in an approved leave status." Appx339.

## IV.   **Ms. Barnes's Extended Absence Without Leave**

As demonstrated above, Ms. Barnes was never granted leave beyond August 16, 2019.  Nevertheless, Ms. Barnes was absent for 24 more workdays from August 19, 2019, through September 20, 2019.  Appx284–286; Br. (ECF No. 15) at 18 ("Petitioner does not dispute that she was out of the office on the days indicated in the Proposed Removal").

## V.   **The Proposed Removal & Agency Action**

On September 30, 2019, Ms. Sieveke proposed removing Ms. Barnes from Federal service based on three charges: (1) absence without leave (AWOL), (2) lack of candor, and (3) conduct unbecoming a Federal employee.  Appx282–289. After considering the information provided, including Ms. Barnes' oral and written replies, the deciding official, Thomas Howder, sustained the charges and found the penalty of removal to be reasonable in light of the seriousness of the misconduct,

16

the higher standard to which supervisors are held, Ms. Barnes's prior disciplinary history, and her failure to take responsibility for her actions.  Appx276–281.

## VI.   **The Board Sustains All Three Charges And The Penalty Of Removal**

Ms. Barnes timely appealed her removal to the MSPB.  Appx1.  The MSPB sustained all three charges and affirmed the agency's action.  Appx1–40.

## SUMMARY OF ARGUMENT

In this appeal, Ms. Barnes asks that this Court overturn: (1) her charge of her being absent without leave, when it is undisputed that she was absent for 24 days and her supervisor denied her leave; (2) her charge of lack of candor when the evidence shows that Ms. Barnes sought to invoke sick leave and FMLA leave only after her annual leave request was denied and her threats to resign had failed, and did so to go on an extended trip for her side-business; (3) her charge of conduct unbecoming a Federal employee when the evidence shows she threatened her supervisor with resignation and mischaracterized her supervisor's actions, all before a hand-picked audience of GSA colleagues; and (4) a thoughtful and reasonable weighing of the appropriate *Douglas* factors, primarily on the grounds that Ms. Barnes denies having engaged in the charged conduct in the first place.  In so asking, Ms. Barnes asks this Court to overturn an MSPB decision that is well supported by substantial evidence, by primarily arguing that the MSPB did not credit her implausible version of the events.

17

Because Ms. Barnes has no meritorious arguments on appeal, she argues that affirming the MSPB's decision will invite "unsupportable managerial meddling in all manner of physician-validated leave," Br. at 3. But nothing could be further from the truth. To begin, her requests for FMLA leave and sick leave only arose after her annual leave request was denied and her threat to resign failed. Moreover, as the board found, Ms. Barnes was repeatedly advised that the documentation that she submitted lacked details necessary for the agency to determine whether Ms. Barnes met the legal criteria for the invocation of such leave, and Ms. Barnes never attempted to secure such information from her doctor. In short, in this appeal, Ms. Barnes does not seek to protect FMLA and sick leave rights, but to require the GSA and the MSPB to rubberstamp the flimsiest invocations of those leave requests, in contravention of regulations, and to turn a blind eye towards blatant misconduct.

As explained below, substantial evidence supports the board's conclusion that GSA proved all three charges. Additionally, the board ensured that the GSA's chosen penalty considered the appropriate *Douglas* factors and was reasonable in light of the sustained charges. Ultimately, Ms. Barnes disagrees with the conclusions that the administrative judge drew after weighing the evidence, but she

18

fails to demonstrate any reversible error.  Accordingly, this Court should affirm the

decision of the MSPB.

## ARGUMENT

## I.    Standard Of Review

The scope of judicial review of MSPB decisions is narrowly defined and is

limited by statute.  5 U.S.C. § 7703(a).  An MSPB decision must be affirmed

unless it is found to be:

> (1) arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law;
>
> (2) obtained without procedures required by law, rule, or
> regulation having been followed; or
>
> (3) unsupported by substantial evidence.

5 U.S.C. § 7703(c); *Hayes v. Dep't of Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984).

"In determining whether the board's decision is supported by substantial

evidence, the standard is not what the court would decide in a *de novo* appraisal,"

*Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987) (citing *Brewer v.*

*U. S. Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981)), but whether the decision is

"supported by such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion," *Shapiro v. Social Sec. Admin.*, 800 F.3d 1332,

1336 (Fed. Cir. 2015) (quoting *Abrams v. Soc. Sec. Admin.*, 703 F.3d 538, 542

(Fed. Cir. 2012)).  If the board's decision is supported by "relevant evidence as a

reasonable mind might accept as adequate to support a conclusion," the Court will not overturn it. *Brewer*, 647 F.2d at 1096 (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). In short, "[i]t is not for this court to reweigh the evidence before the Board," *Henry v. Dep't of Navy*, 902 F.2d 949, 951 (Fed. Cir. 1990), but rather, "the judicial function is exhausted" when the Court finds a "rational basis" for the board's conclusions, *Carroll v. Dep't of Health & Human Servs.*, 703 F.2d 1388, 1390 (Fed. Cir. 1983) (citations omitted).

"The burden of establishing reversible error in an administrative decision, such as the Board's, rests upon the petitioner." *Fernandez v. Dep't of Army*, 234 F.3d 553, 555 (Fed. Cir. 2000).

## II. Ms. Barnes Has Failed To Meet Her Burden Of Establishing Reversible Error Regarding The Board's Determination That Ms. Barnes Was Absent Without Leave

"In order to prove a charge of AWOL, an agency must show by preponderant evidence that the employee was absent, and that his absence was not authorized or that his request for leave was properly denied." *Noble v. U.S. Postal Serv.*, 556 F. App'x 941, 943 (Fed. Cir. 2013) (quoting *Wesley v. U.S. Postal Serv.*, 94 M.S.P.R. 277, 283 (2003)). The administrative judge determined that Ms. Barnes was absent from duty, that her absence was not authorized, and that her requests for leave were properly denied. Appx19. The judge also correctly

20

observed the "inherent relationship between continuous unexcused absences and the efficiency of the service," Appx29.  *See Bryant v. Nat'l Sci. Found.*, 105 F.3d 1414, 1417 (Fed. Cir. 1997) ("[T]he nexus between the charged offense and the efficiency of the service is automatic when the charged offense is AWOL.").

   On appeal, Ms. Barnes "does not dispute that she was out of the office on the days indicated in the Proposed Removal," and acknowledges that her supervisor denied her leave requests.  Br. at 18, 22.  However, Ms. Barnes argues that her sick leave request was denied unreasonably for two reasons.[4]  Br. at 22–28.  Neither of

---

[4]  Although Ms. Barnes includes a "Relevant Facts" section primarily pertaining to the denial of her annual leave request, Br. at 18–22, she does not argue that such leave should have been granted.  Nor could she; the facts she adduces are insufficient to even support even a colorable argument.  For example, Ms. Barnes's testimony that Ms. Sieveke simply agreed to "go along with Ms. Philcox's determination" and then "[s]uddenly and inexplicably . . . changed her mind," Br. at 19, is contrary to both the testimony of Ms. Sieveke, Appx59, and Ms. Barnes's own subsequent explanation that when the re-organization was delayed, the "leave remained denied," Appx337.  In view of the conflicting accounts of Ms. Sieveke and Ms. Barnes regarding their conversation, the judge credited Ms. Sieveke's testimony.  Appx12.  The judge further explained it was "highly unlikely" that Ms. Sieveke "would have simply agreed that another supervisor could unilaterally make the final decision on the appellant's leave request regardless of whether the appellant was still in her division and under her supervision" in light of Ms. Sieveke's "initial denial of the appellant's leave request and her concern about the impact of the appellant's absence on the organization," Appx12. The judge's decision to credit Ms. Sieveke's account is "virtually unreviewable" on appeal.  *Henry*, 902 F.2d at 953.  In another example, Ms. Barnes implies that the denial of her annual leave request was unfair because Ms. Sieveke "previously allowed other direct reports to appoint an acting director," Br. at 21.  However, rebutting one of many reasons Ms. Sieveke offered would be

Ms. Barnes's arguments shows that the board erred in sustaining the AWOL charge.

### A.    Substantial Evidence Supports The Board's Conclusion That Ms. Sieveke Reasonably Denied Ms. Barnes's Sick Leave Request

Ms. Barnes argues that the administrative judge "adduced a series of facts that have questionable legal or probative value" and that "unjustifiably presume that Petitioner's health was not the motive behind her request for sick leave." Br. at 25. For example, she takes issue with the judge noting that "there is no indication that the [Petitioner] sought medical treatment prior to August 1, 2019 after Ms. Sieveke denied her request for annual leave or LWOP." Br. at 25 (alteration in original) (quoting Appx16). She also appears to object to the judge observing that her alleged period of incapacitation was "essentially the same time period that the appellant had previously sought leave to run a retreat for her personal business in Bali. Br. at 26 (quoting Appx17). She warns that affirming the agency's action in view of these facts would entitle a manager to "withhold

---

insufficient, and, in any case, Ms. Sieveke explained that those direct reports were not supervisory, unlike Ms. Barnes, Appx84–85.

Additionally, Ms. Barnes includes a section regarding whether her documentation was sufficient under the FMLA, Br. at 22–25, but she does not argue that the FMLA leave was improperly denied. This is because, when Ms. Barnes received a request for more information regarding her FMLA request, Ms. Barnes withdrew her FMLA request instead of providing the required information from her doctor.

22

sick leave if she has any suspicion that an employee might not be using sick leave for the stated purpose." *Id.*

To begin, Ms. Barnes's apocalyptic warning is completely unmoored from this case because these facts were not why the Ms. Sieveke "withheld" leave; Ms. Barnes's failure to provide sufficient information upon request was. Appx339. Moreover, the AWOL charge was sustained based on the insufficiency of Ms. Barnes's medical documentation, Ms. Barnes's not providing the additional information Ms. Sieveke requested, and the fact that her medical documentation was refuted by her conduct and testimony. Appx16–19. In assessing the propriety of the denial of Ms. Barnes's sick leave, the judge began by correctly outlining the standard for granting sick leave and the proof required, then applied that standard to the facts of this case. Appx16–19.

To the extent that Ms. Barnes suggests that a supervisor cannot request additional information from an employee requesting sick leave when he or she suspects that the employee is not using sick leave for approved purposes, that is incorrect. *See, e.g., Ottinger v. Dep't of Air Force*, 82 F.3d 434 (Fed. Cir. 1996) (affirming AWOL charge and the propriety of the denial of sick leave request where petitioner failed to produce sufficient medical information from her doctors, which the supervisor requested after learning that petitioner "was enrolled in

23

nursing classes").  Ms. Barnes also provides no authority for the proposition that the board may not consider the context of a leave request, including events surrounding the request, to determine whether an AWOL charge should be sustained.  In fact, the opposite appears to be true.  *See, e.g., Beverly v. U.S. Postal Serv.*, 907 F.2d 136, 137 (Fed. Cir. 1990) (affirming AWOL charge and the propriety of the denial of sick leave request where petitioner "was seen at a football game during the time she should have been working").  Accordingly, Ms. Barnes has not established that these facts are irrelevant.

In any case, even if those facts were irrelevant, the board's acknowledgment of them provides no grounds for reversal.  As discussed below, the board's affirmance of the AWOL charge was not based on these facts, but instead on the insufficiency of Ms. Barnes's medical documentation, her failure to provide the additional information Ms. Sieveke requested, and the fact that her medical documentation was inconsistent with her conduct and testimony.  Appx16–19.  As explained below, each of these reasons is a valid to support a denial, and each of these conclusions is supported by sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Brewer*, 647 F.2d at 1096.

First, the judge concluded that Ms. Barnes's "medical documentation was insufficient to support the appellant's request for extended sick leave" because,

24

among other things, the symptoms it listed—like stress, anxiety, and elevated blood pressure—"fail[ed] to indicate why the appellant cannot perform her job duties or why she requires seven weeks of leave." Appx17. This summary accurately reflects the documentation submitted, Appx294–300, and mirrors the relevant test set forth in regulations, which provide that sick leave is appropriate when an employee is "incapacitated for the performance of his or her duties by physical or mental illness, injury, pregnancy, or childbirth," 5 C.F.R. § 630.401(a)(2). Simply put, the documents Ms. Barnes provided did not allow the agency to determine whether she was "incapacitated for the performance" of her duties for seven weeks because they did not explain the "intensity and severity" of her ailments, Appx17. This is a proper basis, supported by substantial evidence, for concluding that Ms. Barnes was reasonably denied sick leave. *See, e.g.*, *Washington v. Dep't of Army*, 813 F.2d 390, 393 (Fed. Cir. 1987) (affirming denial of leave where the employee failed to submit "material necessary to support her claim that she was incapacitated for work").

Next, the judge accurately observed that Ms. Barnes was advised by Ms. Rivero, that her "limited medical documentation did not specify the effects of her condition, the frequency and duration of her symptoms, or why she was unable to perform her specific job functions," and that Ms. Sieveke requested specific

additional information, including "'the triggers and symptoms associated with [the appellant's] conditions as it relates to performing her job duties in the workplace' and why two weeks of leave with additional leave to attend to behavioral therapy sessions or other appropriate treatment would not be sufficient." Appx17–18 (quoting Appx290–291). The judge found, based upon the evidentiary and testimonial record, that Ms. Barnes provided "no evidence or argument" that she "made any effort to provide" this additional information from her doctor. Appx18. Again, this is a proper basis, supported by substantial evidence, for concluding that Ms. Barnes was reasonably denied sick leave. *See, e.g., Taylor v. U.S. Postal Serv.*, 393 F. App'x 717, 719 (Fed. Cir. 2010) (affirming AWOL charge despite petitioner's "claims that he believed that the doctor's letter he submitted in July 2007 obviated the need for further documentation" because "the Service requested additional medical evidence in September 2007" and the petitioner "never provided the requested information"); *Rivers v. Dep't of Veterans Affs.*, 153 F. App'x 716, 718 (Fed. Cir. 2005) ("Given [petitioner's] failure to provide the agency with the requested medical documentation . . . substantial evidence supports the AJ's determination that [petitioner] was AWOL for the asserted time period."); *see also* 5 C.F.R. § 630.405(b) ("An employee must provide administratively acceptable evidence or medical certification for a request for sick

26

leave no later than 15 calendar days after the date the agency requests such medical certification. . . . An employee who does not provide the required evidence or medical certification within the specified time period is not entitled to sick leave.").

Finally, the judge concluded that Ms. Barnes's own statements about her conduct contradicted the claim in her medical documentation that she was incapacitated. Appx18. The judge observed that once Ms. Barnes arrived in Bali, she posted on social media that she had "[l]ots of prep work to do" before commencing the retreat. Appx18, Appx367. In her retreat promotional materials, Ms. Barnes indicated that she was available to provide "highly personalized input" for the participants, in addition to "15 hours of group coaching" as well as "over 40 hours available for one-on-one coaching." Appx18, Appx364, Appx370. The judge reasonably concluded that it was "difficult to fathom" that a person who was able to do all of the above was "medically unable to perform any duties of her position." Appx18. Again, this is a proper basis, supported by substantial evidence, for concluding that Ms. Barnes was reasonably denied sick leave. *See, e.g.*, *Beverly*, 907 F.2d at 137 (affirming AWOL charge and the propriety of the denial of sick leave request where petitioner "was seen at a football game during the time she should have been working"); Appx342 ("Supervisors may disapprove

27

an employee's claim for sick leave . . . if they possess sufficient facts to be reasonably certain that the employee's request is fraudulent.").

## B.    Ms. Sieveke's Request For Additional Information Was Proper

Ms. Barnes also argues that Ms. Sieveke's request for additional information was improper because the documentation she provided on August 1, 2019, required the agency to grant her sick leave.  Br. at 27–28; 22–25.  In support, Ms. Barnes relies on 5 C.F.R. § 630.405(a), which, in relevant part, permits an agency to "require a medical certificate or other administratively acceptable evidence as to the reason for an absence . . .  for an absence in excess of 3 workdays," and 5 C.F.R. § 630.201, which defines a "medical certificate" as a "written statement signed by a registered practicing physician or other practitioner certifying to the incapacitation, examination or treatment."  *See* Br. at 22. According to Ms. Barnes, because she already provided the form signed by her doctor, Ms. Sieveke could not request any additional information, and was required to grant her sick leave request at that point.  Br. at 22.

That is incorrect.  Although the submission of administratively acceptable evidence is necessary for the agency to grant sick leave—the form of the documentation alone neither automatically requires an agency to grant that leave nor forecloses the agency from requesting additional information.  *See* 5 C.F.R.

28

§ 630.405(a) ("An agency *may* grant sick leave *only* when the need for sick leave is supported by administratively acceptable evidence." (emphases added)); *see also Taylor*, 393 F. App'x at 719 (affirming AWOL charge despite petitioner's "claims that he believed that the doctor's letter he submitted in July 2007 obviated the need for further documentation" because "the Service requested additional medical evidence in September 2007" and the petitioner "never provided the requested information").

Rather, the purpose of submitting administratively acceptable evidence is to demonstrate the "*reason*" the employee meets the criteria for sick leave. The regulation provides, in relevant part: "An agency may also require a medical certificate or other administratively acceptable evidence *as to the reason for an absence* for any of the purposes described in § 630.401(a) for an absence in excess of 3 workdays, or for a lesser period when the agency determines it is necessary." 5 C.F.R. § 630.405(a) (emphasis added). Thus, the documentation must provide "the reason," *id.*, that the employee is "incapacitated for the performance of his or her duties by physical or mental illness, injury, pregnancy, or childbirth," 5 C.F.R. § 630.401(a)(2), for the duration of her sick leave.[5]

---

[5] GSA's time and leave regulations are in accord. *See* Appx340 ("Purpose. Sick leave is leave which is granted for use when an employee is physically incapacitated to do his or her job, or for related reasons. Such related reasons are:

Indeed, "[m]edical documentation which fails to, *inter alia*, inform the employer of an employee's prognosis, dates of incapacitation, *restrictions on performance of her duties*, and expected return to duty has been deemed to be administratively insufficient to support a request for sick leave." *New-Howard v. Dep't of Veterans Affs.*, 590 F. App'x 972, 974 (Fed. Cir. 2014) (internal citation and quotation marks omitted) (emphasis added); *see also, e.g.*, *Thom v. Dep't of Army*, 114 M.S.P.R. 169, 172 (M.S.P.B. 2010) ("[N]one of the appellant's medical documentation, including the September 16, 2005 certificate, indicated that the appellant was incapacitated for duty because of these conditions, or otherwise explained why the appellant was absent during the relevant time period.").

The documentation Ms. Barnes provided did not indicate the "reason" for her absence, 5 C.F.R. § 630.405(a), because it did not indicate why any of her symptoms made her "incapacitated for the performance of . . . her duties," 5 C.F.R. § 630.401(a)(2), nor did it indicate that those symptoms otherwise created "restrictions on performance of her duties," *New-Howard*, 590 F. App'x at 974, nor did it "otherwise explain[] why the appellant was absent during the relevant time period," *Thom*, 114 M.S.P.R. at 172.

---

a. Exposure to a contagious disease that would endanger the health of coworkers. . . . b. Required to give care and attendance to a member of his/her immediate family who is afflicted with a contagious disease.").

30

Instead, the form indicated that Ms. Barnes had "high blood pressure," a "headache due to anxiety, symptoms of fatigue, depressed mood, severe anxiety and stress," Appx295, but, without any indication of duration or severity of these symptoms, the form does not provide a "reason" why Ms. Barnes was medically incapable of performing *any* of her duties for *any* amount of time for seven weeks.[6] *Accord* Appx16–17.  Ms. Barnes was notified of these defects on several occasions.  *See, e.g.*, Appx290 ("[B]ased on your doctor's statements, it appears that you were treated once on 8/1/2019 and she did not validate the nature and/or history of your medical conditions; specify the effects of your condition; the frequency and duration of the symptoms; and why you are not able to perform any of your job functions."); Appx339 ("While your doctor checked 'yes' to box 5 stating that you will be incapacitated for a single continuous period of time from 8/1/19 - 9/20/19, your doctor does not state the reason.").

Finally, even if this Court were inclined to view Ms. Barnes's August 1, 2019, documentation as acceptable, "the standard is not what the court would decide in a *de novo* appraisal," *Parker*, 819 F.2d at 1115.  Rather, this Court must

---

[6] Paradoxically, the form also indicated that a reduced work schedule was "not needed," and that, after Ms. Barnes's trip, there would be no further events that would prevent Ms. Barnes from performing her job or making it medically necessary for her to be absent.  Appx296.

31

affirm the board's decision unless Ms. Barnes meets *her* burden of establishing that it is not in accordance with the law or not supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Brewer*, 647 F.2d at 1096. *See Fernandez*, 234 F.3d at 555. Ms. Barnes has not made that showing.

### III.   Ms. Barnes Has Failed To Meet Her Burden Of Establishing Reversible Error Regarding The Board's Determination That Ms. Barnes Showed A Lack Of Candor

The board's decision sustaining the two specifications of the lack of candor charge is supported by substantial evidence and in accordance with law. Lack of candor "is a broader and more flexible concept" than falsification, and its "contours and elements depend upon the particular context and conduct involved." *Ludlum v. Dep't of Just.*, 278 F.3d 1280, 1284 (Fed. Cir. 2002). Although "[f]alsification involves an affirmative misrepresentation, and requires intent to deceive," *id.* (citing *Naekel v. Dep't of Transp.*, 782 F.2d 975, 977 (Fed. Cir. 1986), a lack of candor charge may be sustained when the employee "gave incorrect or incomplete information and did so knowingly." *Martin v. Dep't of Homeland Sec.*, 855 F. App'x 691, 697 (Fed. Cir. 2021). Moreover, "[a]lthough lack of candor necessarily involves an element of deception, 'intent to deceive' is not a separate element of that offense—as it is for 'falsification.'" *Ludlum*, 278

F.3d at 1284–85.  Accordingly, a lack of candor charge may be sustained in light

of a "failure to disclose something that, in the circumstances, should have been

disclosed in order to make the given statement accurate and complete."  *Id.* at

1284.  Both specifications meet that standard.

### A. The Board's Determination To Sustain The Lack of Candor Charge Regarding Specification 1 Was Supported By Substantial Evidence and In Accordance With Law

In the first specification, the agency asserts that Ms. Barnes demonstrated a

lack of candor when, by email on August 1, 2019, she submitted a FMLA request

for seven weeks "in connection with her recently diagnosed health condition."

Appx286–287 (quoting Appx292).  As the board found, Ms. Barnes's FMLA

request "did not indicate that she was intending to leave the country for a retreat in

Bali," despite the fact that she only requested FMLA leave after her annual leave

for the purposes of hosting that retreat was denied.  Appx20.  Moreover, Ms.

Barnes's conversation with Emily Plank—which Ms. Plank memorialized in an

email, Appx336, that Ms. Barnes said seemed "accurate," Appx337—demonstrates

that Ms. Barnes knew that she was invoking FMLA leave without knowing

whether she was eligible, but was doing so in order to side-step her supervisor's

denial of her annual leave request.  In relevant part, the email states:

> You indicated that you don't know if FMLA is necessary for your
> absence, as you don't need disability or "ongoing things". You stated

33

> that you had tried to utilize your accrued leave without invoking FMLA, but your supervisor wouldn't approve more than 2 weeks of leave.

Appx336.  Additionally, the email demonstrates that Ms. Barnes intended to use the leave to destress (which is undoubtedly a common purpose of all leave), which is why she did not want to use FMLA leave:

> You mentioned various symptoms brought on by stress and indicated that you need to be away from the office to focus on self-care for the 6 weeks you had planned**.** You reiterated that FMLA is not something you wanted to do; you wanted to use accrued leave.

Appx336.

Based on this evidence, the board sustained the first specification: Ms. Barnes lacked candor when she attempted to use FMLA leave—which is for a "serious health condition that makes the employee unable to perform the functions of the employee's position," 5 U.S.C. § 6382(a)(1)(D)—in order to go on her retreat to Bali, without disclosing that was her purpose.

Ms. Barnes argues that the board erred by sustaining the first specification because:  (1) the fact that Ms. Barnes was in Bali "does not prove that she supplied incorrect information, knowingly or otherwise," (2) "[h]er supervisor and staff were aware of the reason for her leave request," and (3) "the Agency has not pointed to any policy that requires an employee to remain home while on sick leave."  Br. at 29–31.  However, none of these arguments satisfies Ms. Barnes's

34

burden of establishing reversible error.

Ms. Barnes's first argument—concerning whether she "supplied incorrect information, knowingly or otherwise" Br. at 31—conflates the standard for a "falsification" charge with the "lack of candor" standard.   Although "[f]alsification involves an affirmative misrepresentation, and requires intent to deceive," lack of candor "is a broader and more flexible concept" and its "contours and elements depend upon the particular context and conduct involved." *Ludlum*, 278 F.3d at 1284.  As is relevant here, a lack of candor charge may be sustained based "failure to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete." *Id*. Accordingly, a lack of candor charge may be sustained when the employee "gave incorrect *or incomplete* information and did so knowingly." *Martin*, 855 F. App'x at 697 (emphasis added).

Here, the board found that, in connection with this request, Ms. Barnes failed to disclose that the purpose of her FMLA leave was for her trip to Bali. Appx22.  Instead, Ms. Barnes's request sought "leave in accordance with the Family Medical Leave Act for a period of 7 weeks in connection with [her] recently diagnosed health condition," and makes no mention of the trip.  Appx292. Because the purpose of FMLA is to provide leave when an employee has a

"serious health condition that makes the employee unable to perform the functions of the employee's position," 5 U.S.C. § 6382(a)(1)(D), a reasonable jurist could find that her failure to disclose the true purpose of her FMLA request—to go on a pre-planned trip to Bali despite her supervisor's prior denial of her annual leave request—was a knowing omission.  That conclusion is supported by the evidence of Ms. Barnes's conversation with Ms. Plank, which revealed that Ms. Barnes did not believe she qualified for FMLA, but was just looking for a way to circumvent her supervisor's annual leave denial. Appx337.

Ms. Barnes's second argument—that "[h]er supervisor and staff were aware of the reason for her leave request," Br. at 29—is unavailing.  The fact that the Ms. Sieveke knew that Ms. Barnes's FMLA request was in bad faith is hardly exonerating.  As stated above, a lack of candor charge may be sustained based on the "failure to disclose something that, in the circumstances, should have been disclosed in order to make *the given statement* accurate and complete." *Ludlum*, 278 F.3d at 1284 (emphasis added).  None of the instances Ms. Barnes cites in support of her argument that she "asserted that she would be conducting a series of women in leadership sessions in Bali," Br. at 31, are in any way connected to "the given statement," her FMLA request.  *See* Appx58–59 (Ms. Sieveke testifying that "at the time of the [initial] request for leave," Ms. Barnes did not assert "any

36

medical reason for her request," but instead asserted that she "was teaching a

workshop for her side organization, that she was conducting a series of women in

leadership sessions in Bali."), Appx172 (Ms. Barnes testifying about her

conversation with Ms. Philcox—not Ms. Sieveke—which also preceded the FMLA

request).  Accordingly, it is undisputed that, in connection with the "given

statement," the FMLA request, Ms. Barnes failed to disclose that the purpose of

her FMLA leave was for her trip to Bali.[7]

Ms. Barnes's third argument—that "the Agency has not pointed to any

policy that requires an employee to remain home while on sick leave," Br. at 30—

misses the point.  As stated above, the lack of candor charge may be sustained

based on the "failure to disclose something that, in the circumstances, should have

been disclosed in order to make *the given statement* accurate and complete."

*Ludlum*, 278 F.3d at 1284 (emphasis added).  Here, Ms. Barnes failed to disclose

the true purpose of her trip in the "given statement."

## B. The Board's Determination To Sustain The Lack of Candor Charge Regarding Specification 2 Was Supported By Substantial Evidence and In Accordance With Law

In the second specification, the agency asserts that Ms. Barnes demonstrated

---

[7] To the extent Ms. Barnes argues that she could not have intended to deceive Ms. Sieveke in light of her prior disclosures, that is also irrelevant because an "'intent to deceive' is not a separate element of [the lack of candor] offense," *Ludlum*, 278 F.3d at 1294–85.

a lack of candor when, due to the fact her prior leave requests were denied, she

submitted a request for sick leave for the period from August 19, 2019, through

September 20, 2019, when she was not incapacitated, but instead on a retreat in

Bali. Appx287. Similar to the first specification, the board concluded that Ms.

Barnes failed to disclose the real reason for her requested absence, which was to

have an extended vacation in Bali, in which she could further her personal business

interests by conducting a retreat in that location. Appx22.

The board's decision is supported by sufficient "relevant evidence as a

reasonable mind might accept as adequate to support a conclusion," *Brewer*, 647

F.2d at 1096. On August 15, 2019, Ms. Barnes emailed Ms. Sieveke and Ms.

Philcox to request sick leave through September 20, 2019. Appx338. The request

omits any reference to her trip to Bali, or the retreat she planned to host as part of

her side business, and instead states that her request is "based on the medical

diagnosis and care plan that my doctor provided to me," and purports to interpret

GSA policies. Appx338. The judge observed that GSA's time and leave policy

provides that sick leave is "leave which is granted for use when an employee is

physically incapacitated to do his or her job, or for related reasons," Appx21

(quoting Appx340); *accord* 5 C.F.R. § 630.401(a)(2). Those "related reasons" do

not extend to destressing or hosting retreats, but concern only "contagious"

diseases. *See* Appx340. Thus, Ms. Barnes's request implied that the purpose of her leave was due to physical incapacitation, and omitted the material fact that she was hosting a retreat for paying customers while on vacation. Substantial evidence supports the board's decision sustaining the second specification.

Ms. Barnes argues that the second specification should not be upheld because: (1) in "order to establish the element of deception, an agency must prove that the petitioner knowingly made an incorrect statement" but "the Agency cannot prove that Petitioner knowingly made any incorrect statements" because she "suffered from several qualifying conditions" and (2) "the fact that this sabbatical took place in Bali and coincided with non-work-related activities is not legally relevant," Br. at 32–33.

Ms. Barnes's first argument—concerning whether she "knowingly made any incorrect statements" because she "suffered from several qualifying conditions," Br. at 32—merely reanimates and combines two unmeritorious arguments we already addressed. At the outset, Ms. Barnes has not demonstrated that any of her conditions qualified her for sick leave for the reasons we explained above. Moreover, the entire framework of this argument is virtually identical to the first argument she makes against the first specification and fails for the same reasons. In short, this argument attempts to apply the standard for a "falsification" charge,

39

which requires "an affirmative misrepresentation, and requires intent to deceive," instead of the "lack of candor" standard, which may be satisfied based on the "failure to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete." *Ludlum*, 278 F.3d at 1284. And, as explained above, Ms. Barnes's sick leave request omitted the material fact that she was hosting a retreat for paying customers while on vacation.

Ms. Barnes's second argument—asserting that it is "not legally relevant" that she was on "sabbatical" in Bali, where she performed "non-work-related activities," Br. at 33—also fails. Those facts are relevant because they "should have been disclosed to make the given statement accurate and complete," *Ludlum*, 278 F.3d at 1284. By withholding those facts, Ms. Barnes's communication requesting sick leave was necessarily incomplete and inaccurate, because her sick leave request (by its nature and her statements) suggested that she was "incapacitated for the performance of his or her duties," 5 C.F.R. § 630.401(a)(2). By failing to disclose her activities during the proposed sick leave—such as the "[l]ots of prep work" undertaken to commence the retreat, and providing "highly personalized input" for its participants, including up to "15 hours of group coaching" as well as up to 40 hours of "one-on-one coaching," Appx364,

40

Appx367, Appx370, she rendered her statement concerning her eligibility for sick leave incomplete and inaccurate. As the board reasonably concluded, it is "difficult to fathom" that a person who was able to do all of the above was "medically unable to perform any duties of her position." Appx18. Accordingly, this Court should reject Ms. Barnes's argument that these misleadingly omitted facts were "legally irrelevant."[8]

## IV.    Ms. Barnes Has Failed To Meet Her Burden Of Establishing Reversible Error Regarding The Board's Determination That Ms. Barnes Engaged In Conduct Unbecoming A Federal Employee

The charge of conduct unbecoming a Federal employee is based on an email Ms. Barnes sent to Ms. Sieveke, the Federal Acquisition Services Leadership Council and the Workforce Transformation Division, with the subject line "My conditional resignation" on July 22, 2019. Appx287. The notice of proposed removal characterized this email as an "ultimatum" designed to "intimidate and

---

[8] To the extent Ms. Barnes is arguing that these leisure and side-work activities are somehow consistent with sick leave, she provides no authority for that proposition. The authority supports the opposite conclusion. *See, e.g.*, *Beverly*, 907 F.2d at 137 (affirming AWOL charge and the propriety of the denial of sick leave request where petitioner "was seen at a football game during the time she should have been working"); *cf. Gray v. U.S. Postal Serv.*, No. 05-3074, 2005 WL 1368093, at *3 (Fed. Cir. June 9, 2005) (affirming MSPB holding that employee of nine years "should have been aware of the impropriety of working a second job while receiving paid sick leave"); *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 435 (Fed. Cir. 1986) ("The Service also has an interest in assuring that employees do not abuse sick leave by taking vacations to far-away places.").

pressure" Ms. Sieveke into approving the leave request based on her threat to

resign and it contained an "inaccurate delineation of the facts surrounding" her

request for leave.  Appx287.  The board found that Ms. Barnes did not dispute that

she sent this email, and concluded, based on the record, particularly the testimony

of Ms. Sieveke and Mr. Howder, that sending this email constituted conduct

unbecoming of a Federal employee.  Appx22–27.

On appeal, Ms. Barnes disputes the GSA's characterization of the email, but

declines to cite to the email itself.  Br. 34–35; *see* Appx335.  Ms. Barnes first

argues that the GSA "never pinpointed the specific facts that were supposedly an

'inaccurate delineation,'" Br. at 35, but she provides no authority for the

proposition that this is grounds for reversal.  In any case, the judge concluded, after

considering evidence and hearing testimony, that the email contained several

falsehoods.  Appx22–27.  For example, Ms. Barnes claimed that Ms. Sieveke

"rescinded" her "approval," for Ms. Barnes's sabbatical, but, as the judge found,

"there is no evidence that Ms. Sieveke approved the absence at any time," Appx26.

Indeed, after receiving conflicting testimony from Ms. Sieveke and Ms. Barnes

regarding whether Ms. Sieveke delegated her authority to grant or deny Ms.

Barnes's leave request to Ms. Philcox, the judge credited Ms. Sieveke's testimony.

Appx12.  This credibility determination is "virtually unreviewable" on appeal.

42

*Henry*, 902 F.2d at 953. Moreover, as discussed above, Ms. Barnes admitted to a human resources representative that her leave "remained denied" because the re-organization did not occur—not that it was granted and rescinded. *See* Appx336. Accordingly, Ms. Barnes's email did, in fact, contain an "inaccurate delineation of the facts surrounding" her request for leave, Appx287.

Ms. Barnes also argues that her email "cannot plausibly be read" as an "ultimatum" designed to intimidate and pressure Ms. Sieveke because she also told other GSA employees that she would resign if her leave request was denied. Br. at 35. In support, she cites only to her own affidavit's characterization of two communications. *Id.* (citing Appx265 ¶¶ 35 & 36). Contrary to the brief's representations, however, the first cited paragraph does not support the proposition that Ms. Barnes told Ms. Rivero that she would resign unless her leave was granted. *See* Appx265 ¶ 35. Additionally, although the second cited paragraph (¶ 36) does reference an email contemplating Ms. Barnes's resignation, the full context of that email is revealing. *See* Appx327. In that email, Ms. Barnes asked whether Ms. Philcox was "willing" to accept Ms. Barnes as a detail assignment for the purposes of Ms. Philcox approving her leave. *Id.* Ms. Barnes continued: "Otherwise, I'll be regretfully submitting my resignation this afternoon." *Id.* Earlier in the same email chain, Ms. Barnes warned Ms. Philcox that her

43

resignation would "leave [her] team and several executives [she had] been working with in a lurch." Appx328. If anything, this communication reveals yet another instance in which Ms. Barnes was willing to wield the threat of her resignation to secure her six weeks of leave. It is unclear why, as a matter of common sense, threatening another person with one's resignation disproves the original threat.

To the extent Ms. Barnes argues that her threat to resign was "merely factual," Br. at 35, that argument relies on the reversing the judge's "virtually unreviewable" decision, *Henry v.*, 902 F.2d at 953, not to adopt Ms. Barnes's testimony, Appx185, and is belied by the record. As the deadline for her threatened resignation approached without producing the desired effect of causing Ms. Sieveke to grant her full leave request, Ms. Barnes "rescind[ed]" her "conditional resignation." *See* Appx338. Ms. Barnes can point to no other facts that had changed that would have caused her to withdraw her "conditional resignation"—other than the fact that her bluff had been called. The Court should reject this argument, and affirm the board's decision sustaining the conduct unbecoming charge.

## V.    The Court Should Not Disturb The Board's Determination That Removal Was A Reasonable Penalty

In determining the appropriate penalty, Ms. Sieveke thoroughly considered each of the factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280

44

(1981). Appx311–315. The deciding official independently considered and adopted Ms. Sieveke's analysis. Appx115–120, Appx279. The board, in turn, concluded that the penalty of removal was reasonable in light of the relevant *Douglas* factors—particularly the seriousness of the offenses, Ms. Barnes' supervisory role at GSA, her supervisor's loss of confidence in her, and her failure to express remorse or take responsibility for her actions, Appx27–31.

Because the "choice of penalty is committed to the sound discretion of the employing agency," *Guise v. Dep't of Just.*, 330 F.3d 1376, 1382 (Fed. Cir. 2003), this Court will defer "to the agency's choice of penalty unless the penalty exceeds the range of permissible punishment specified by statute or regulation, or unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Archuleta v. Hopper*, 786 F.3d 1340, 1352 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

Ms. Barnes argues that the penalty of removal was unreasonable. Br. at 35–44. However, she provides no basis to overturn the board's decision. To begin, Ms. Barnes presents no arguments demonstrating that the penalty "exceeds the range of permissible punishment specified by statute or regulation," *Hopper*, 786 F.3d at 1352. In fact, Ms. Barnes "acknowledges that if she committed the misconduct as alleged, removal would be permissible under the table of penalties,"

Br. at 41.

Nor does Ms. Barnes present any arguments demonstrating that the penalty is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Hopper*, 786 F.3d at 1352. Instead, Ms. Barnes essentially asks this Court to reevaluate the *Douglas* factors. *See* Br. at 35–44. This request ignores this Court's function, which is "not to conduct a de novo review of agency disciplinary proceedings in order to determine what penalty [it] might have imposed." *Graybill v. U.S. Postal Serv.*, 782 F.2d 1567, 1574 (Fed. Cir. 1986). In any event, Ms. Barnes has failed to demonstrate that the board failed to examine any significant mitigating factor or erred as a matter of law in its analysis.

The majority of her arguments rely on her assertion that she did not commit the misconduct alleged. *See* Br. at 36–42 (discussing factors 1, 4, 7, 9, 10, and 12). However, this denial is misplaced in the context of the penalty analysis, which is necessarily only undertaken if at least one of the charges against her is sustained. By way of analogy, this argument is like a criminal defendant arguing that he is not guilty at his sentencing hearing. If anything, it only corroborates the board's determination that Ms. Barnes demonstrates a "lack of remorse with respect to [her] conduct," Appx31, which "weighs against mitigating the agency's selected

46

penalty," *Woodson v. Dep't of Homeland Sec.*, 280 F. App'x 976, 981 (Fed. Cir. 2008).

None of her remaining arguments demonstrate that the penalty is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion," *Hopper*, 786 F.3d at 1352. Her arguments concerning the second factor are entirely irrelevant and lack citations to the record or authority. *See* Br. at 36. However, Ms. Barnes is correct to acknowledge that, as a supervisor, she is "held to a higher standard of conduct than other employees," *Garner v. Dep't of Treasury*, 127 F. App'x 477, 480 (Fed. Cir. 2005) (internal quotation marks and citations omitted).

Her arguments concerning the third factor represent little more than a collateral attack on the validity of a prior disciplinary determination. *See* Br. at 38. Even if such an argument were permissible, Ms. Barnes has not demonstrated that the prior discipline was unwarranted. At most it shows yet another incident in which Ms. Barnes claims that an oral conversation happened one way and the other person in that conversation claims it went the other way, Br. at 37–38—just like her implausible claim that Ms. Sieveke supposedly delegated her leave authority to Ms. Philcox unconditionally. Finally, even if this Court could theoretically second-guess the validity of her prior disciplinary adjudication, the fact that the

47

prior deciding official apparently credited the other person over Ms. Barnes would

still be "virtually unreviewable" on appeal, *Henry v.*, 902 F.2d at 953.

Her arguments concerning the fourth factor, Br. at 39, ignore that this factor

specifically considers the "dependability" of the employee.  *See Douglas*, 5

M.S.P.R. at 305 (the fourth factor pertains to the "employee's past work record,

including length of service, performance on the job, ability to get along with fellow

workers, and dependability").  Her argument concerning the fifth factor, Br. at 40,

is an attempt to cherry pick the agency's acknowledgement of her skills and

performance ratings, while ignoring the myriad explanations of how her

misconduct adversely impacted her supervisor's confidence that she would

perform her duties, Appx313.

Regarding the eleventh factor, Ms. Barnes conclusorily asserts that her

"medical issues, significant personal stressors, and professional stress" are

mitigating factors warranting a lesser penalty.  Br. at 42.  However, she fails to

explain how these alleged issues would mitigate the seriousness of her actions—

which she does not even acknowledge constitute misconduct.  The administrative

judge found no reason to disturb the agency's penalty selection and the board does

not commit error by "only discuss[ing] those factors listed in the *Douglas* case it

deemed relevant."  *Nagel v. Dep't of Health & Human Servs.*, 707 F.2d 1384,

1386–87 (Fed. Cir. 1983). Next, Ms. Barnes, somewhat confusingly, attacks the impartiality of a GSA attorney who she claims had some involvement with her prior discipline. Br. at 42–43. Ms. Barnes provides no authority for the proposition that this, in any way, is a mitigating factor.

Given the totality of the circumstances, Ms. Barnes cannot show that the penalty of removal was unwarranted. Although Ms. Barnes seeks to overturn the GSA's chosen penalty, she provides no arguments demonstrating that "the penalty is *so* harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion," *Hopper*, 786 F.3d at 1352 (internal quotation marks and citation omitted). Accordingly, this Court should defer "to the agency's choice of penalty," *id.* As this Court recently explained:

> This highly deferential standard of review is reflective of the great reluctance on the part of the courts to become enmeshed in the disciplinary process, as the employing (and not the reviewing) agency is in the best position to judge the impact of the employee misconduct upon the operations of the agency, the prospects for the employer's rehabilitation and improvement, and the need to maintain and encourage high standards of conduct by all employees.

*Vestal v. Dep't of Treasury*, 1 F.4th 1049, 1053 (Fed. Cir. 2021) (internal quotation marks and citations omitted).

## **CONCLUSION**

For these reasons, this Court should affirm the decision of the MSPB.

49

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Bret R. Vallacher
BRET R. VALLACHER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-0465
Facsimile: (202) 305-2062
Email: bret.r.vallacher@usdoj.gov

September 20, 2021                    *Attorneys for Respondent*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify under penalty of perjury that the attached brief is proportionately spaced using Microsoft Word, uses a Times New Roman typeface in 14 point font size, and, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2), contains 11,557 words.

/s/ Bret R. Vallacher